UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Target Corporation,

       Plaintiff,

v.                                                   Case No. 16-cv-1184 (JNE/TNL)
                                                 ORDER

JJS Developments LTD o/a ERS
International,

       Defendant.

Michael A. Ponto and Kyle R. Hardwick, Faegre Baker Daniels LLP, appeared for Target Corporation.

Leny K. Wallen-Friedman and Diana Young Morrissey, Wallen-Friedman & Floyd, P.A., appeared for JJS Developments LTD o/a ERS International.

     Target Corporation and JJS Developments LTD o/a ERS International ("ERS") entered into several contracts for the sale of certain assets by Target to ERS. Claiming that ERS did not pay the amount due after the termination of one of the contracts, Target brought this action against ERS for breach of contract, unjust enrichment, and conversion. ERS asserted counterclaims for fraud, negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing. The case is before the Court on Target's Motion for Summary Judgment. For the reasons set forth below, the Court grants in part and denies in part Target's motion.

## I. BACKGROUND

Target is a discount retailer. In the course of its business, it acquires assets whose disposal it seeks by recycling or other means. ERS is in the business of asset disposition services, asset destruction auditing, data destruction, and material control services.

### *Non-TV Contracts*

In 2014, Target issued several requests for quotes, seeking a purchaser of certain assets for recycling or other disposition. The assets included electronics from Target's headquarters, assets and electronics from Target's stores and distribution centers, and electronics that Target accepted from its customers for recycling. ERS responded to Target's requests, and Target awarded contracts to ERS. Target and ERS executed a Purchaser Qualification Agreement, as well as three program agreements.[1] Each program agreement had an effective date of June 28, 2014, and an expiration date of June 30, 2016.

The Purchaser Qualification Agreement states that it "applies to and is incorporated into all agreements relating to the sale . . . of merchandise and other assets ('**Goods**') and/or the work, tasks or projects to be performed ('**Services**') between [ERS] and Target, including any program agreement specific to the Goods and Services entered into the by the parties ('**Program Agreement**')" and that the terms of a program agreement govern in the event of a conflict between the program agreement and the Purchaser Qualification Agreement. The Purchaser Qualification Agreement contains the following warranties by Target:

---

[1] The parties referred to the three program agreements as the Non-TV Contracts.

Target Warranties.  Target has the right to sell the Goods; provided, however, that with regard to any Goods that include embedded software or consist, in whole or in part, of other computer software, Target makes no representation or warranty as to Target's right to sell or Purchaser's right to use the embedded software or other computer software.  Target is consigning and/or selling the Goods **"AS IS", "WHERE IS", WITH ALL FAULTS, WITHOUT WARRANTY OR REPRESENTATION OF ANY KIND EXPRESSED OR IMPLIED, INCLUDING ANY WARRANTY AS TO THE NON-INFRINGEMENT OR THE KIND, SIZE, WEIGHT, QUALITY, CHARACTER, FUNCTIONALITY, DESCRIPTION, DURABILITY, CONFORMITY WITH ANY SPECIFICATIONS OR CONDITION OF THE GOODS, THE PACKAGING OR LABELING OF THE GOODS, THE MERCHANTABILITY OF THE GOODS OR THEIR FITNESS FOR ANY PARTICULAR, SPECIAL OR INTENTED PURPOSE.**  Without limiting the foregoing, the condition and use of the Goods shall be at the sole risk of Purchaser.  Target is not responsible for any damages to any person or property as a result of the possible deficiencies or failures of the Goods.

### *DDTV*

In July 2014, Target sought a purchaser of certain damaged or defective televisions.  ERS responded, and, in August 2014, Target awarded a contract to ERS.[2]  ERS agreed to pay $17 per television.

### *TV Unsaleables*

A few months later, Target issued a request for quotes.  It sought a purchaser of returned and damaged televisions.  Target anticipated an 18-month contract starting in December 2014.  It advised potential bidders of "substantial volume growth" in May 2015 "due to a change in programs at Target."  Target provided forecasts of the volume of televisions subject to the program from the start of the contract to May 2015 and from May 2015 to the end of the contract.  Target also provided estimates of the screen sizes

---

[2]  The parties referred to this program as the DDTV program.

and damage rates. It advised potential bidders that the estimates were not guaranteed: "Any volumes, conditions, mixes provided in the sourcing event are not a guarantee. Estimates are provided for planning purposes only and will vary with Target store openings and seasonal trends."

ERS responded to the request, and Target awarded the contract to ERS. Target and ERS executed a program agreement for the "Purchase of TV Unsaleables." The agreement's effective date was December 21, 2014, and its expiration date was June 20, 2016. The program agreement acknowledged the estimates that Target had provided:

> Target has made projections and forecasts of the amount of Goods that Target estimates may be available (the actual amount may be less than or more than any projections or forecasts). [ERS] understands and agrees that these numbers are estimates only and, unless otherwise expressly stated in this Program Agreement, Target is not obligated to sell or consign any specific quantity of Goods to Supplier. Goods may be sold or consigned by Target or by an affiliate of Target, including Target's contracted service provider.

A statement of work, which was attached to the program agreement as an exhibit, described the goods to be purchased by ERS: "Unsaleable TV's are items that have been either returned to the store by a Target guest, classified as defective merchandise in store or on Target.com returned items sent via mail." The statement of work also reiterated that "[a]ny volumes, condition, or mixes provided in the sourcing event are not a guarantee. Estimates are provided for planning purposes only and will vary with Target store openings and seasonal trends."

In the request for quotes, Target provided estimates of damage rates by brand. In total, it estimated that 67.0% of the televisions would be "No Fault Found," that 9.2%

4

would be "Repairable," and that 23.8% would be "Salvage/Scrap." The condition of the televisions that ERS bought from Target under the TV Unsaleables program did not conform to the estimates provided by Target. For instance, a condition report, which was sent by ERS to Target in early February and was based on approximately 5,500 televisions, indicated that approximately 43% of the televisions had cracked or broken glass, rendering the unit "a teardown/salvage unit." An audit conducted by Target in April 2015 characterized 51% of the televisions as no fault found, 13% as repairable, and 36% as damaged.

ERS notified Target of the discrepancies between the estimated and actual conditions of the televisions and sought pricing concessions. Negotiations took place before and after ERS gave 90-day notice of termination in early March 2015. The parties did not agree to a modification. The TV Unsaleables program agreement terminated in early June 2015. Target has not received payment from ERS for several loads of televisions.

### *Termination of Non-TV Contracts*

In September 2015, Target notified ERS that Target had discovered "listings by multiple pallet salvagers that appear to be marketing full pallets of Target merchandise that should have been recycled via ERS." Target directed ERS's attention to a section of the scope of work of the electronics recycling program agreement for assets and electronics from Target's stores and distribution centers. The section prohibits resale of merchandise "in original form." ERS explained to Target that ERS had sent a small amount of goods to a subcontractor, that the subcontractor had not properly handled the

5

goods, and that ERS had taken steps to recover the goods. According to ERS, Target advised ERS that Target would continue to honor the contracts. Nevertheless, in October 2015, Target terminated the Non-TV Contracts.

## II.   DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must view genuinely disputed facts in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.   Convention on Contracts for the International Sale of Goods

The parties disputed whether the United Nations Convention on Contracts for the International Sale of Goods ("CISG") applies. "As 'a self-executing [treaty] between the United States and other signatories, including Canada,' the Convention supersedes state law when it applies." *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 748 F.3d 780, 787 (7th Cir. 2014) (alteration in original) (quoting *Chicago Prime Packers, Inc. v.*

6

*Northam Food Trading Co.*, 408 F.3d 894, 897 (7th Cir. 2005)).  The CISG "applies to contracts of sale of goods between parties whose places of business are in different States when the States are Contracting States."  CISG art. 1(1).  For purposes of the CISG, "if a party has more than one place of business, the place of business is that which has the closest relationship to the contract and its performance, having regard to the circumstances known to or contemplated by the parties at any time before or at the conclusion of the contract."  CISG art. 10(a).

Target maintained that the CISG does not apply because the parties' places of business are in the United States.  ERS maintained that the CISG does apply because Target's place of business is in the United States and ERS's place of business is in Canada.

Although the Purchaser Qualification Agreement and each program agreement that ERS and Target executed identifies a Canadian address as ERS's principal address, ERS acknowledged that "[p]artnering with Target was a major opportunity for ERS; to accommodate Target's product volume, ERS opened an Indianapolis facility and invested in substantial infrastructure for transport, inspection, repair and repackaging, disassembly and recycling, rerouting and disposal of TVs and other electronic products."  The Court concludes that ERS's place of business for the purposes of ERS's contracts with Target is in the United States.  The CISG does not apply.

**B.   ERS's counterclaims**

**1.   Fraud—TV Unsaleables**

ERS alleged that Target engaged in fraud by knowingly providing false "Condition Estimates, mix of screen sizes, and sorting criteria" in the TV Unsaleables request for quotes. Target moved for summary judgment on ERS's fraud claim on two grounds. First, Target asserted that the forecasts provided in the request for quotes cannot form the basis of a fraud claim because the forecasts were not representations of past or existing material facts. Second, Target asserted that "any purported reliance by ERS was unreasonable as a matter of law."

> Under Minnesota law, the elements of a fraud claim are:
>
> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance.

*Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986); *see Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009). "Projections should be considered actionable or not in fraud, depending upon whether they accurately reflect surrounding past and present circumstances." *Berg v. Xerxes-Southdale Office Bldg. Co.*, 290 N.W.2d 612, 615 (Minn. 1980); *see Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 876 (8th Cir. 1991). There is evidence in the record that Target's forecasts did not accurately reflect surrounding past and present circumstances. For instance, reports from the incumbent salvager about televisions sold from December

8

2013 to July 2014 indicated that 30% of the televisions were salvage or scrap. The incumbent salvager also submitted a bid in response to Target's request for quotes in which the salvager explained its proposed pricing: "The reason for the drastic decline from our 33% currently to 20% is because the influx of the previously bid out visibly damaged. Current salvage rates are around 33% - we expect that the climb to over 42% with the influx of the visibly damaged." The Court rejects Target's assertion that the forecasts cannot form the basis of a fraud claim.

To support its argument that reliance by ERS on Target's forecasts was unreasonable as a matter of law, Target relied on disclaimers that appeared in the Purchaser Qualification Agreement, the request for quotes, and the program agreement. The Purchaser Qualification Agreement states that "Target is consigning and/or selling the Goods **'AS IS', 'WHERE IS', WITH ALL FAULTS, WITHOUT WARRANTY OR REPRESENTATION OF ANY KIND EXPRESSED OR IMPLIED**." The request for quotes states: "Any volumes, conditions, mixes provided in the sourcing event are not a guarantee. Estimates are provided for planning purposes only and will vary with Target store openings and seasonal trends." The program agreement provides that "[a]ny volumes, condition, or mixes provided in the sourcing event are not a guarantee" and that "[e]stimates are provided for planning purposes only and will vary with Target store openings and seasonal trends." It also states that, "[e]xcept as set forth in the [Purchaser Qualification Agreement], Target makes no representations or warranties whatsoever with respect to the Goods, or sale of Goods to, Supplier."

9

"The only situation in which the Minnesota courts have held that a contract provision negatives a claim of fraud is where the provision explicitly states a fact completely antithetical to the claimed misrepresentations." *Commercial Prop. Invs.*, 938 F.2d at 875. "[E]ven fairly specific disclaimers are typically held to create jury questions about reliance, rather than to negate reliance as a matter of law." *Randall v. Lady of Am. Franchise Corp.*, 532 F. Supp. 2d 1071, 1086 & n.10 (D. Minn. 2007). Target provided the estimates "for planning purposes only." Viewing the record in the light most favorable to ERS, the Court concludes that there is a genuine issue of material fact as to whether ERS reasonably relied on the forecasts. The Court denies Target's motion on ERS's fraud claim.

### 2. Negligent misrepresentation—TV Unsaleables

ERS alleged in the alternative that Target negligently misrepresented the condition estimates, mix of screen sizes, and sorting criteria to ERS in the request for quotes for the TV Unsaleables program agreement. Target moved for summary judgment on the grounds that Minnesota Statutes § 604.101 bars the claim, that ERS cannot demonstrate Target failed to exercise reasonable care, and that ERS cannot show justifiable reliance on Target's forecasts. ERS responded that section 604.101 bars certain misrepresentation claims unless the misrepresentation was made intentionally or recklessly, that Target's misrepresentations were made intentionally or recklessly, that Target failed to exercise reasonable care in preparing the forecasts, and that ERS reasonably relied on the information provided by Target.

10

"A buyer may not bring a common law misrepresentation claim against a seller relating to the goods sold or leased unless the misrepresentation was made intentionally or recklessly." Minn. Stat. § 604.101, subd. 4 (2016); *see Valspar Refinish*, 764 N.W.2d at 370 ("We conclude that under Minn. Stat. § 604.101, subd. 4, a buyer of goods is barred from bringing a common-law negligent misrepresentation claim against the seller that relates to the goods sold."). The Court grants Target's motion on ERS's claim of negligent misrepresentation.

### 3. Breach of contract—TV Unsaleables

ERS claimed in the alternative that Target breached the TV Unsaleables program agreement by providing televisions to ERS that did not conform to the estimates set forth in the request for quotes. Target moved for summary judgment, arguing that it was not obligated that provide televisions that conformed to the estimates. For present purposes, the Court assumes that the program agreement was a valid, enforceable contract.

In the purchaser qualification agreement, Target disclaimed any warranty as the kind, size, or quality of the goods sold. The TV Unsaleables program agreement states that "[a]ny volumes, condition, or mixes provided in the sourcing event are not a guarantee" and that "[e]stimates are provided for planning purposes only and will vary with Target store openings and seasonal trends." It also provides that, "[e]xcept as set forth in the [Purchaser Qualification Agreement], Target makes no representations or warranties whatsoever with respect to the Goods, or sale of Goods to, Supplier." Target did not contractually obligate itself to provide televisions to ERS that conformed to the

11

estimates in the request for quotes. The Court grants Target's motion on ERS's claim for breach of the TV Unsaleables program agreement.

### 4. Breach of contract—Non-TV Contracts

ERS claimed that "Target breached the Non-TV Contracts by shipping ERS out-of-scope materials and by terminating them on the basis of non-material breaches that ERS cured and that Target waived." Target asserted that summary judgment in its favor is appropriate because its "right to cancel was not dependent on the materiality of ERS's breaches" and because ERS cannot show "any damages as a result of Target's alleged breaches." ERS responded that "a non-material breach does not provide a basis for terminating an agreement"; that "[e]ven if a non-material breach was sufficient, Target waived that breach by continuing to perform under the contract without objection"; and that "ERS has provided documentation to Target setting forth lost income as well as expenses incurred that can no longer be recovered because of Target's improper termination of the agreement."

To support its argument that its right to cancel did not depend on the materiality of its alleged breaches, Target relied on the following provision that appears in each of the Non-TV Contracts: "Target may terminate this Program Agreement immediately by providing written notice to Supplier if Supplier breaches any provision of this Program Agreement." Target reasoned that the provision does not require that a breach be material to allow Target to terminate. The Court rejects Target's argument. *See Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 921 (8th Cir. 2013) ("To justify termination, the breach must be material.").

Target maintained that ERS did not sustain any damages from the cancellation of the Non-TV Contracts because the contracts were not exclusive and included no guaranteed supply of goods. Target also argued that ERS has not demonstrated that ERS sustained any damages caused by Target's alleged shipping errors. ERS responded that it "has provided documentation to Target setting forth lost income as well as expenses incurred that can no longer be recovered because of Target's improper termination of the agreement." Target maintained that the documents on which ERS relied "are merely accounting schedules, neither of which speaks for itself." In addition, Target asserted that ERS waived claims for reimbursement of expenses or for lost profits.

"Under Minnesota law, damages for breach of contract must be proved to a reasonable certainty, and a party cannot recover speculative, remote, or conjectural damages. 'Once the fact of loss has been shown, the difficulty of proving its amount will not preclude recovery so long as there is proof of a reasonable basis upon which to approximate the amount.'" *Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1016 (8th Cir. 2001) (citation omitted) (quoting *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977)).

One of the exhibits that ERS cited to support its claim for damages contains transaction reports in various categories such as professional fees, machinery and equipment, payroll expenses, and equipment. The other also contains transaction reports, a summary of startup and closing costs, and a calculation of "loss of income." In the Purchaser Qualification Agreement, ERS "expressly waive[d] any claim whatsoever regarding the reimbursement of expenditures made in support of this Agreement." ERS

13

also "expressly agree[d] that on termination, Target shall not be liable to [ERS] for any compensation or indemnification of any kind, whether on account of loss of present or prospective profits, or loss of goodwill or clientele, or anticipated revenue, expenditures, investments or commitments made in connection herewith, arising solely by virtue of termination by Target." In the Non-TV Contracts, ERS agreed to essentially identical terms.

At the motion hearing, ERS argued that its waiver of damages does not apply because Target improperly terminated the Non-TV Contracts on the basis of non-material breaches. The Court assumes for present purposes that Target did so. The Non-TV Contracts allowed either party to terminate them without cause by providing 90 days' notice. ERS's calculation of loss of income extends from October 2015 to the expiration of the Non-TV Contracts and beyond. ERS provided no factual basis to support its calculation of damages. The Court grants Target's motion on ERS's claim for breach of the Non-TV Contracts. *See Mattson Ridge, LLC v. Clear Rock Title, LLP*, 824 N.W.2d 622, 633 (Minn. 2012) ("Because there is a reasonable factual basis to support the court's award of lost profits to Mattson Ridge, we sustain the court's calculation of Mattson Ridge's damages."); *Leoni*, 255 N.W.2d at 826.

### 5.    Breach of the covenant of good faith and fair dealing

ERS alleged that Target breached the implied covenant of good faith and fair dealing by refusing to address the discrepancy between the estimated and actual conditions and sizes of the televisions sold to ERS, "by concealing the true sorting criteria for the televisions," and "by abandoning its efforts to negotiate in good-faith with

14

ERS to revise the contract to reflect the actual condition and screen-size mix of the televisions." Target moved for summary judgment on the ground that "Minnesota law does not recognize an independent action for breach of such a covenant."

"The implied covenant of good faith and fair dealing does not apply to sales contracts . . . ." *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 303 n.5 (Minn. Ct. App. 2004); *see Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) ("Minnesota law does . . . impose an implied covenant of good faith and fair dealing into every non-sales contract to prevent one party from unjustifiably hindering the other party's performance of the contract."). The Court grants Target's motion on ERS's counterclaim for breach of the implied covenant of good faith and fair dealing.

**C.    Target's claim for breach of contract**

Target moved for summary judgment on its claim for breach of contract. "A successful breach-of-contract claim under Minnesota law has four elements: '(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages.'" *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013) (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000)). Target asserted that "[t]here is no dispute that the TV Unsaleables Program Agreement is a legally binding contract—both parties seek to enforce the Agreement by their claims and counterclaims in this action." ERS asserted a claim for breach of the TV Unsaleables program agreement as an alternative to its fraud claim. It asserted it was fraudulently

15

induced to enter into the contract.  Having denied Target's motion for summary judgment on ERS's fraud claim, the Court denies Target's motion for summary judgment on Target's claim for breach of contract.  *See Carpenter v. Vreeman*, 409 N.W.2d 258, 260-61 (Minn. Ct. App. 1987) ("A contract is voidable if a party's assent is induced by either a fraudulent or a material misrepresentation by the other party, and is an assertion on which the recipient is justified in relying.").

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Target's Motion for Summary Judgment [Docket No. 46] is GRANTED IN PART and DENIED IN PART.

2. Counts II, III, IV, and V of ERS's counterclaims are DISMISSED WITH PREJUDICE.

Dated: February 9, 2018

s/ Joan N. Ericksen<br>
JOAN N. ERICKSEN<br>
United States District Judge